Van Brunt, P. J.
The affidavits in the four cases are similar so far as respects the allegations claiming to establish the fraud of the defendant, and in the discussion of the questions involved upon this appeal those in only one of the cases will be referred to.
The attachments in question were issued upon the affidavits of Charles J. Abbott, Eugene Wulzo and Albert Schmidt.
The affidavit of Abbott after alleging the indebtedness of the defendant to the plaintiff, Bladfield, Stamp & Heacock, who did business in London, England, and alleging an indebtedness to other foreign creditors, states that during the month of March, 1886, the plaintiff applied for a settlement of his account in conjunction with accounts alleged to be due to the other plaintiff herein, who are also attaching creditors.
That the defendant expressed his inability to pay said claims, or any of them, and requested? an extension of time, and that to induce such extension, made a written statement of his condition showing his total liabilities, foreign *447 and domestic, to be the sum of $224,046.53, and his assets as follows:
Beal estate valued at........................ $58,000 00
Cash balance on hand....................... 11,242 92
Merchandise as per inventory................ 180,555 08
Merchandise in Europe...................... 757 56
Store office fixtures......................... 3,000 00
Sundry debtors, balance and favor........... 39,656 32
Bills receivable, notes on hand............... 1,642 47
$294,854 65
The difference between the liabilities being $70,808.12 in favor of the defendant.
The said Abbott further states in his affidavit upon information and belief that the defendant made a statement to the commercial agency as appears by a statement issued by said agency under date of March 28, 1886, showing that the defendant’s inventory of February 1, 1886, was:
Stock, about................................ $200,000 00
Open accounts, good........................ 30,000 00
Bills receivable............................ 14,000 00
Land on Staten Island...................... 50,000 00
Leasehold of building....................... 8,000 00
Cash....................................... 12,000 00
$314,000 00
Liabilities.................................. 175,000 00
Leaving him worth......................... $139,000 00
The said Abbott further states that influenced entirely by the said representations, the plaintiff consented to an extension.
That said extension having expired and no payments being made in November twenty-nine, the defendant having been pressed for payment the defendant made the following statement of his condition, asking for a compromise of fifty cents on the dollar:
Liabilities.............................. $211,699 89
AssGts *
Stock on hand.............................. 100,000 00
Outstanding open accounts................... 27,098 91
Bills receivable.............................. 751 86
Cash on hand............................... 2,129 87
Total................................. $126,980 64-
*448 The said Abbott then states that a comparison of this statement with the one previously set forth herein shows a difference in assets in the possession of the defendant on January 1, 1886, and on November 29) 1886, to be $167,784.01, which affirmation is as evidently untrue and Was so to Abbott’s own knowledge as can be claimed in respect to any. affirmation contained in any of defendants’ affidavits or statements and seems to have been made with the intention of misleading the court as he knew that the defendant still owned the Staten Island real estate put in the first statement of $58,000, and the store fixtures valued -in the first statement at $3,000.
The said Abbott said further states that in the last part of November, 1886, having applied to the defendant for payment, that defendant refused to give any information except that he had written a proposition to the other side and expected an answer to that, and that defendant refused to make any payment whatever, and that he, the said Abbott, has since learned that the proposition to which defendant referred was his offer of fifty cents to the dollar, and that the defendant had threatened, if his offer was Hot accepted, that he would make an assignment. The affidavit then states that in view of the circumstances above detailed, that said Abbott verily believes that the defendant has disposed of or has secreted property or is about to dispose of his property with intent to defraud his creditors. The affiant has not explained how it was possible that the defendant, if he had disposed of or secreted his property, could be about td do so.
The affidavit then states that the defendant had admitted his insolvency and that the defendant Was committing the grave offense of, notwithstanding these facts, buying and selling riiercharidiSe arid doirig business iti every respect as though he Was solvent, arid then alleges that by this itieatis he is depleting his stock of merchandise, the inference drawn, however, being not by ariy tiieans apparent, as we fail to comprehend how by the buying and selling of merchandise he necessarily depletes á stock in trade.
The affidavit of Wolzo simply states that he is the agent of one of defendants’ foreign creditors and that the stock of goods carried by. defendant had not been depreciated in value during the past year; and that when he requested defendant to explain to him the mysterious difference ill value of his assets,. he could .give no explanation of the same and simply stated .that what he wanted was a settlement of fifty cents or that he would have to make an assignment, and that the defendant had admitted that he had obtained about $16,000 .on chattel mortgage recently.
*449 It appears that defendant never borrowed anything on chattel mortgage whatever.
The affiant Schmidt swears that he came to this city on the ninth of November as the agent for these foreign attaching creditors, and that the statement of November 29, 1886, was handed by the defendant to him, and that even the same day the defendant told him, Schmidt, that if his proposition of fifty per cent on the dollar was not accepted he would make an assignment, and that in any case several creditors, whom he named, he would pay in full. The said Schmidt further deposes that he knew the defendant to be insolvent, and seeing him carry on his business from day to day, asked for a small payment on account; that the defendant replied that he would not pay a single dollar until he had the assent of all his creditors; that they would settle in full for fifty cents, and that he had not paid a dollar to any of his creditors since he had made his proposition, and would not until it was accepted, and that if he could not get a settlement he would make an assignment.
The affiant then makes the sweeping assertion that he believes that the defendant has, during the past year, disposed of or secreted his property to the extent of upwards of $100,000, and is about to dispose of his remaining property with intent to defraud his creditors.
The ground upon which the affiant Schmidt’s belief is founded he has studiously kept to himself; in any event he has not disclosed it in his affidavit.
The attachments issued upon the foregoing affidavits having been levied upon the property of the defendant, a motion was made to vacate the attachments upon the affidavits of the defendant, Charles Bolt, his bookkesper, Otto Jeschke, Josiah Brown, Frederick Hoffman, Denis J. Hart, John J. Donavan, clerks of the defendant and the affidavits of several merchants.
In his affidavit the defendant admits the making of the statement of March, 1886, claiming, however, it to have been a mere informal statement, admits making the statement of November 29, 1886, which statement he claims to have been simply a rough statement, and to have been so understood by the parties, admits saying that he would make an assignment unless he was able to make a compromise, and alleging that since said attachments he has made an assignment with preferences; that he has been doing a losing business for some period of time.
That all his books of account, merchandise and assets are in the hands of the sheriff under the attachments, and that he has applied to the plaintiffs’ attorneys for permis *450 sion to examine his books and inventory of January, 1886, which has been denied, and that upon an examination of said books and inventory it would appear precisely what had become of all merchandise contained in said inventory and of the proceeds thereof, and that he had made a motion to the court to compel permission to examine said books, etc.
In a subsequent affidavit the defendant states that having obtained permission to examine said books and stock, he commenced doing so on January 18, 1887.
That in assigning values to the stock he adopted the prices of January, 1886, as far as said stock consisted of the same articles as were on hand January 23, 1886, but as to articles bought since January 23, 1886, they were taken at cost; and that the merchandise thus inventoried, to-
tether with some goods sold by the assignee, amounted to 183,416.60, or nearly three thousand dollars more than the inventory of January, 1886..
As to the method of keeping books and the fact that no property either came in or went out of the store without being entered upon the books, the defendant is corroborated by the affidavits of his clerks above mentioned.
In reply, the plaintiffs read the affidavit of Mr. Strauss, proving the assignment of Mr. Frey; proving the representations to the mercantile agency—the affidavit of Mr. Schmidt contradicting some of the details of the defendant’s affidavit; the affidavit of Mr. Wolzo stating without the slightest apparent knowledge, among other things, that the $15,000 raised on the mortgage on real estate is no where accounted for, which on the contrary the defendant asserts appears upon his books, and said affidavit stating deductions which he makes from the statements of the defendant, in which he does not take the slightest account of any purchases of merchandise, and contradicted allegations of the defendant which are not contained in his affidavits.
The plaintiff also read the affidavits of certain merchants declaring that there had been no fall in the value of merchandise during the preceding year.
The motion to vacate the attachment being thereupon denied these appeals are taken.
In the foregoing statement it has not been attempted to give more than an outline of the voluminous affidavits used in these proceedings.
The plaintiff claims to show by the disparity between the March and November statements a disappearance of merchandise, and by the defendant’s threats to make an assignment, an intent to dispose of property for the purpose of defrauding creditors.
If the plaintiffs were pursuing the defendant because of *451 false representations contained in the statement of March 18, 1886, and in the statements to the mercantile agency, we could understand the strength of the case made by him, but false representations as to mercantile standing form no ground for an attachment.
The claim that the discrepancy between the valuation of merchandise in the March and November statements shows a disappearance of merchandise to a large amount is conclusively disproved by the evidence upon the part of the defendant that by a comparison of his books and the merchandise on hand with the inventory of January, 1886, it can be shown precisely what part of the merchandise has been sold and what has become of the proceeds.
If this claim is not well founded or the evidence in respect thereto is false, the plaintiffs had it in their power to prove the same, having possession of books, merchandise and inventory. In fact, it would seem that the plaintiffs were fearful that the defendant could justify himself if he had access to his merchandise and books, and, therefore, such access was refused until it was compelled by an application to the court.
It is no answer to this conclusive evidence to say that it is a well known fact that failing merchants usually manifest their prudence by showing an apparently well kept set of books, because experience has shown to the contrary that the books of failing merchants are never well kept, and the absence of books has always been considered one of the strongest indicia of bad faith.
The claim that there is nothing in these counter affidavits which shows that the defendant has not sold goods which were valuable at nominal figures, or has not disposed of goods which were shipped to him before delivery at the store, or that he himself had not disposed of them after delivery there, or that he has not disposed of the proceeds of sales during last year, or that he has not appropriated the large sums which he borrowed on mortgage and on merchandise, certainly cannot be sustained, because in those affidavits in connection with the stock of merchandise, books and inventory, the defendant has conclusively explained the apparent discrepancies in his statements. If the defendants claim that his books show all merchandise sold, all meichandise bought, all merchandise on hand, that all borrowed money went into the business, the plaintiffs, being in possession of the books, could easily have demonstrated the falsity of the falsity of the statement.
The affidavit in the court of sessions, to which reference has'not been heretofore made, adds no weight to the plaintiff’s claim of a fraudulent disposition of his property, as it is but a reiteration of the statement made'in March.
*452 We are told that arithmetical calculation will demonstrate the impossibility of selling $140,000 worth of goods out of a total of $180,000 worth, and still leave two-thirds of the stock undisturbed. This proposition is undoubtedly correct, but it has not the slightest application to the facts presented in the case at bar, as it is nowhere pretended that the $140,000 of sales were made out of goods on hand in January, 1886. One of the complaints contained in the plaintiff’s affidavits is that the defendant was buying as well as selling merchandise.
The learned counsel for the plaintiffs call special attention to the additional affidavit of the defendant pretending to show by items his stock now on hand, in which there is no account whatever made of stock purchased since January, 1886, and that nowhere in his affidavits does the defendant claim to have purchased sufficient new goods to account at once for sales of this magnitude and the reservation of such a large proportion of his original stock.
The affidavit of the defendant preceding the statement referred to shows that in figuring up the merchandise in the store, goods purchased since January, 1886, were taken at cost prices and that the footing was arrived at by adding the inventoried prices of the goods on hand contained in inventory to the cost prices of goods on hand bought since the inventory. _ "
_ It is further claimed that the defendant being solvent in November, 1886, the threat to make an assignment showed a fraudulent intent.
The evidence, however, is overwhelming, if the affidavits read on the part of the plaintiffs can be believed, that the defendant was insolvent in November, 1886.
Abbott swears that the defendant admitted his insolvency to him, which he evidently believed, and Schmidt swears that he knew he was insolvent.
The threat to make an assignment was not a fraud nor the payment of certain creditors in full in preference to others as under the law the defendant had the right to do both of these things.
It would appear that these foreign creditors had entered upon the scheme of securing their debts by attachment, having no reasonable or proper grounds to suppose that the defendant had been guilty of the fraud alleged.
We are of the opinion therefore that there was no ground shown for the maintenance of the attachments and that they should have been vacated.
The orders appealed from should be reversed with ten dollars costs and disbursements in each case.
*453 Brady, J.
In these appeals, the opinions already written by my associates are elaborate and convincing, and it may be that nothing more can be effectively said, but I am impressed with the absence of proof showing a fraudulent disposition or concealment of property by the defendant, and of any intention to dispose or conceal it or any of it fraudulently. The difference between the charge of obtaining goods by false representations and the fraudulent disposition of property should be kept constantly in view in the examination of these appeals. While as to the former there would be grave elements to consider if such were the accusation, as to the latter, the gravamen of the complaint is inference and inference only. It is assumed and contended that the great disparity in figures between estimates made first and last cannot be accounted for on any other assumption than fraudulent disposition or concealment as sales are not disclosed, or depreciation established which will account for the seeming diminution.
These inferences are denied or explained, and it is asserted in affidavits read on behalf of the defendant that except by ordinary sales the defendant’s stock had not been taken away or concealed. Aside from this the circumstances under which the statements were made are important whether upon an actual examination of the stock on hand and a careful estimate of its value, or a general informal valuation indicated so. to be with evil intent, and this applies to all estimates involved in the statements made. If, excepting ordinary sales, the property of which the estimate was originally given remains, it does not matter what its valuation was said to be It is indeed wholly immaterial on an issue as to a fraudulent disposition or concealment, however important it might be on an allegation of sales made on the faith of its truthfulness. When the answer is made, and it is apparently true: “I admit that I over-estimated the value of my property, but I have it yet, excepting ordinary sales,” the charge of fraudulent disposition and concealment is logically and meritoriously overcome. This seems to be the best point of view in which the facts appear on behalf of the plaintiff.
I, therefore, concur with my associates.
Daniels, J.
One of the two legal grounds upon which it has been strenuously insisted that the attachment in this and three other cases depending upon similar evidence should be sustained, is, that the debtor asserted his design to be to make an assignment for the benefit of his creditors in case a compromise should not be effected between himself and the persons to whom he was indebted. He had been engaged in business as a dealer in furs for many years, and. *454 in the latter part of the year 1886 found himself financially unable to discharge his debts as he had agreed to do that. And to relieve himself from the emergency in which he was placed, he proposed to these creditors that they should compromise their indebtedness, with him at the rate of fifty cents on the dollar, or that he should make an assignment, and in his statements and correspondence mentioned what were supposed would be the result to the creditors of making the assignment. There was no assertion of any intention on his part to place any part of his property beyond the reach of his creditors, or to make any illegal preferences in favor of one class of creditors over another, but the design was stated to be to make an assignment which would probably prove prejudicial to these particular creditors, and at the same time burden the estate by the expenses of the trust in such a manner as thereby to prevent the creditors from securing the same advantages that they would through a voluntary compromise.
No disposition was expressed or manifested to subject the execution of the trusts under the assignment to any illegal or unlawful expenses, but the belief was disclosed that a settlement of" the debtor’s estate in that manner would necessarily be attended with expenditures and delays which would leave for the creditors a smaller percentage upon their debts than would be secured by them through the acceptance of the compromise proposed by the debtor. This is as extreme a view as the statements of the debtor will justify concerning what was intended to be done if an assignment should become a necessity, and it probably expressed no more than in the settlement of insolvent estates under assignments, has been found to be the practical realization of the facts. They are expensive proceedings often engendering litigation and forced sales of property, diminishing in that manner very much the value, of the assigned estate, and the proceeds finally remaining for distribution among the creditors. And where contests may arise concerning the legality of the instrument itself, or directions contained in it, there a proportionately larger diminution of the final fund must necessarily follow. The solicitude of the debtor seems to have been directed to the avoidance of these results rather than a coercion of the creditors into the acceptance of the terms of compromise. According to the statements made by him, he was anxious to avoid the alternative of an assignment and held out to the creditors what would be the probable consequences to induce them to accept as the most beneficial to themselves, as well as to him, his terms of compromise, instead of obliging him to adopt the other alternative of assigning his property for the benefit of his creditors. Such statements *455 on the part of the debtor do not disclose the existence of an intent through the mediumship of an assignment to dispose of his property to hinder, delay or defraud his creditors, but they are entirely consistent with the design of making such a disposition by means of an assignment, as the law permits debtors to make for the distribution of the proceeds of their property among their creditors. This subject, together with the authorities pertinent to its consideration, was before the court it Farwell v. Furniss (67 How., 188), where it was held that statements, and the expression of purposes or designs, on the part of the debtor in this manner, and of this description, were not sufficient to expose his property to attachment on the ground that he was about to dispose of it to defraud his creditors.
The other circumstance upon which the attachments were placed was the very large discrepancy appearing in the financial condition of the defendant between statements made by him in the early part of the year 1886, and another statement made at the instance of these creditors the last of November of that year. The difference between these statements is very large and striking, so great in fact, if that was all there was of the case, as to raise a very decided probability that the difference could not have arisen in the ordinary course of the transaction of the defendant’s business. The sales made by him out of his stock would not account for its great diminution between the statements in the early and the latter part of the year.
But in explanation of this difference, it has been stated that the statement relied upon, which ivas made near the last of the month of November, was mainly an estimate, hurriedly made, and did not show the actual situation of hisaffairs. And as to this the defendant is confirmed by the statement itself, which mentions the fact that the stock on hand was estimated at the value mentioned in the statement. His real estate is sworn to have been omitted by inadvertence, and so with the fixtures in his store, and no reason appears for doubting the truth of these explanations made by the defendant. And that this latter statement is not to be relied upon as disclosing a condition of the defendant’s affairs which should be binding upon himself, is further sustained by the inventory of the property while it was in. the possession of the sheriff under the attachments. This inventory is shown to have been made upon the same basis as that which was taken in January, 1886. The same prices as far as the property was on hand were adopted, as the value of the stock, when it was in the possession of the sheriff, as had been mentioned in the inventory of the early part of the year. And by taking the inventory in this manner no such discrepancy or difference *456 in its amount appeared as to awaken the suspicion even that the defendant had appropriated or disposed of any part of his property otherwise than by means of sales in the usual course of his business. The latter inventory, following out the scale of prices already mentioned, brought up his stock to the sum of $183,416.60, while in the inventory taken in the early part of the year his merchandise in the city of New York was inventoried at the sum of $180,555.08, and that in Europe at the sum of $756.56. The debts owing to him were still greater than those of the commencement of the year, his fixtures were of the same value, his cash reduced less than the sum of $5,000, and the value of his real estate only so far as it had been encumbered by a mortgage for $15,000, stated to have been borrowed and put into his business.
Between this final statement and that which is related to have been given to the mercantile agency of Dun & Go, there is still a substantial difference, but that is explained by the defendant by the fact that what was said to the representative of the agency was in a general conversation,, in which no items or figures were taken by the agent himself, and which were not designed to vary substantially from the condition in which the estate of the debtor was found as it was exhibited by the inventory of January, 1886. This statement is highly probable, for as the defendant had so recently before the conversation taken this inventory, exhibiting what is assumed to have been a truthful situation of his financial affairs, it is not probable that he intended to depart materially from its results in the conversation between himself and the representative of this agency.
In the statements made by the defendant he is further sustained by those of the persons; in his employment, tending to prove the fact that no part of the stock was taken or disposed of otherwise than in the regular course of business, and was entered in the books of the defendant, which remained in the possession of the sheriff, to which the attaching creditors had access, and could contradict the assertions of the defendant and the persons in his employment, whose affidavits were read upon the hearing, if the entries, did not there appear to be as they have been stated. These-proofs, as has been particularly shown in the opinion of the presiding judge, fully overcame the weight and effect of the affidavits made in support of the attachments, and they placed the case in a position liberated from all real grounds of suspicion that the debtor either had, or intended to, dispose of his property to hinder, delay or defraud his creditors. They removed entirely from the case the suspicion arising out of the difference between the statements of *457 his affairs made in the early part of the year 1886 and the estimated statement of the latter part of November. The charges have been fully and completely answered, and the orders from which the defendant has appealed should, as that has been directed to be done by the opinion of the presiding judge, be reversed and the attachment set aside.